CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JAMES ANGLIN FLYNN (Bar No. 337608)
Email: james_flynn@fd.org
DREW HAVENS (Bar No. 306280)
AYAH A. SARSOUR (Bar No. 340280)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, CA 90012-4202
Telephone: (213) 894-2854
Fax: (213) 893-0081

Attorneys for Defendants
ISMAEL GARCIA, JR. &
JAIME HECTOR RAMIREZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>ISMAEL GARCIA, JR.,<br><br>*Defendant*. | Case No. 2:25-cr-655-MEMF |
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>JAIME HECTOR RAMIREZ,<br><br>*Defendant*. | Case No. 5:25-cr-264-SSS<br><br>**Defendants' Reply in Support of Motion to Dismiss Indictment and to Disqualify**<br><br>Hearing Date: Oct. 14, 2025 |

**INTRODUCTION**

The government's response is a handbook for circumventing the protections that the Constitution and Congress built against the limitless, unaccountable handpicking of temporary officials.

Under the government's interpretation of the Federal Vacancies Reform Act, whenever agency heads want to fill a position requiring Senate confirmation, they can simply fire the first assistant and backfill with anyone they choose. That choice automatically gets the top job under 5 U.S.C. § 3345(a)(1). No need to involve the President as required by subsections (a)(2) and (a)(3), and no need to find someone with eligible government service.

But the FVRA puts all kinds of limits on who can serve and for how long. To sidestep those, the government purports to find an all-purpose vacancies authority hidden between the lines of the organic statues that establish federal agencies. The government claims that agency heads can simply hire their chosen person into *any* agency position, to which they can then delegate all of the vacant office's powers. (Never mind that, when the Department of Justice asserted exactly this delegation theory in the 1990s, Congress passed the FVRA to foreclose it.) Administrations never need seek confirmation for sub-Cabinet offices: they can replicate the entire organizational chart with these never-confirmed, FVRA-ineligible shadow officials. There are no limits or eligibility requirements. They can serve indefinitely.

That cannot be the system Congress accidentally enacted when it passed the FVRA, a "tightly crafted scheme meant to provide only limited flexibility and

prevent 'manipulation.'" *United States v. Giraud* (*Giraud*), No. 1:24-cr-768, 2025 WL 2416737, at *18 (D.N.J. Aug. 21, 2025), *appeal expedited*, No. 25-2635 (3d Cir. Aug. 27, 2025). The government's interpretation "opens a gaping loophole" that "flies in the face of the goal that Congress was trying to accomplish." *Id.*

The Court should reject that loophole, just as it should reject the government's other thinly sourced arguments. In addition to violating the FVRA, Mr. Essayli's service is unlawful under the 120-day clock at 28 U.S.C. § 546(c)(2) and the Appointments Clause. Mr. Garcia and Mr. Ramirez can challenge their criminal prosecution by an unauthorized official—notwithstanding the government's bizarre citations to cases about *plaintiffs'* standing in *civil* cases—and they are entitled to adequate remedies.

On all these issues, the government's response largely ignores the motions' arguments, and it fails even to mention *Giraud* except in a throwaway footnote saying it "was incorrect." Resp. 6 n.3. The Court should rule Mr. Essayli is not the lawful acting U.S. Attorney, void and dismiss the indictments with prejudice, and disqualify Mr. Essayli and his supervisees.

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................................10

    I.   Mr. Essayli's service violates the Federal Vacancies Reform Act. ............10

        I.A.   The government's entire FVRA argument hinges on the unfounded theory that it can designate an acting officer by backfilling the first assistant position...................................................10

        I.B.   The backfilling theory is wrong. ........................................................11

            I.B.1. The government cannot trigger a present-tense statute with a past-tense resignation. ....................................................11

            I.B.2. The backfilling theory defies the FVRA's structure.................12

            I.B.3. The backfilling theory thwarts the FVRA's purpose................15

            I.B.4. The Court should resolve any ambiguity to avoid constitutional doubt..................................................................17

        I.C.   The special-attorney theory violates the FVRA's limits, including § 3347.....................................................................................18

            I.C.1. The special-attorney theory fails at the outset because there has been no lawful special-attorney appointment or delegation. ..................................................................................18

            I.C.2. Congress enacted the exclusivity provision at § 3347 to nullify this exact delegation argument.......................................19

            I.C.3. The special-attorney theory flouts § 3347's text. ....................20

            I.C.4. A special attorney cannot bypass § 3347 by claiming he is not the "acting official." ........................................................21

            I.C.5. The government conflates the exclusivity provision at § 3347 with the ratification bar at § 3348................................22

            I.C.6. The government's conflation of §§ 3347 and 3348 leads it to mischaracterize the case law..........................................24

I.C.7. The special-attorney theory would unravel the FVRA..............25

II.  Mr. Essayli has exhausted the 120-day clock at 28 U.S.C.
      § 546(c)(2). ......................................................................................27

III. Mr. Essayli's service violates the Appointments Clause. ...........................29

IV. The Court should remedy Mr. Essayli's unlawful actions and
      supervision. ......................................................................................32

   IV.A. Criminal defendants do not need civil standing to challenge a
          prosecution. ..................................................................................32

   IV.B. The Court should void and dismiss the indictment with
          prejudice. ......................................................................................32

   IV.C. The Court should disqualify Mr. Essayli and his supervisees
          from participating in criminal proceedings in this district..................36

CONCLUSION .................................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328 (Fed. Cir. 2022)..................25

*Cheneau v. Garland*, 997 F.3d 916 (9th Cir. 2021) (en banc)................................24

*Donziger v. United States*, 143 S. Ct. 868 (2023)....................................................35

*Edmond v. United States*, 520 U.S. 651 (1997) .......................................................30

*Gonzales & Gonzales Bonds & Ins. Agency v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024)....................................24, 25

*Green v. Ariz. Bd. of Regents*, No. CV-18-4665, 2020 WL 2512759 (D. Ariz. May 15, 2020) ...............................................................................33

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767 (9th Cir. 2008) .............................................................................................12

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550 (9th Cir. 2016) ......................................................................................................11

*Jenkins v. County of Riverside*, 398 F.3d 1093 (9th Cir. 2005 ...............................33

*Kajmowicz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022)...............................................25

*L.M.-M. v. Cucinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) ..........................................13

*Lake v. Gates*, 130 F.4th 1054 (9th Cir. 2025) ........................................................36

*Morrison v. Olson*, 487 U.S. 654 (1988) .................................................................30

*Myers v. United States*, 272 U.S. 52 (1926) .............................................................30

*NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017)...........................................................13

*Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132 (2d Cir. 2009) (per curiam) ..........................................................................................25

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020).............17, 28

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ........................................................... 14, 28

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ......................................... 29, 30, 31

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ...................................... 33, 34

*United States v. Eaton*, 169 U.S. 331 (1898) ............................................................31

*United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999) .................................. 30, 31, 34

*United States v. Giraud* (*Giraud Aug. 1 Op.*), 2025 WL 2196794
      (D.N.J. Aug. 1, 2025) ................................................................... 37, 38

*United States v. Giraud* (*Giraud*), 2025 WL 2416737 (D.N.J.
      Aug. 21, 2025) ............ 3, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 25, 36

*United States v. Hilario*, 218 F.3d 19 (1st Cir. 2000) .............................................34

*United States v. Trump*, 740 F. Supp. 3d 1245
      (S.D. Fla. 2024) ............................................... 18, 33, 34, 35, 36, 38

*United States v. Williams*, 68 F.4th 564 (9th Cir. 2023) ..........................................37

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787
      (1987) ................................................................................................35

**Statutes and Constitutional Provisions**

28 U.S.C. § 3731 .......................................................................................................34

28 U.S.C. § 509 .........................................................................................................19

28 U.S.C. § 510 .........................................................................................................19

28 U.S.C. § 515 .........................................................................................................18

28 U.S.C. § 541 .........................................................................................................30

28 U.S.C. § 546 ........................................................................................... 3, 27, 28, 29

5 U.S.C. § 3345 ........................................................................... 2, 10, 11, 13, 16, 17

5 U.S.C. § 3347 ................................................................... 19, 20, 21, 22, 23, 24, 25

5 U.S.C. § 3348 ................................................................... 12, 23, 24, 25, 33

5 U.S.C. § 3349 ................................................................................................12

5 U.S.C. §§ 3346 ..............................................................................................12

U.S. Const. art. II, § 2, cl. 2 ............................................................................3

**Rules**

Federal Rule of Civil Procedure 11 ...............................................................36

Federal Rule of Criminal Procedure 12 ................................................... 33, 34

Federal Rule of Criminal Procedure 7 ..................................................... 33, 34

**Legislative Materials**

S. Rep. No. 105-250 (1998) ................................................... 15, 16, 17, 19, 20, 26

**Periodicals**

Katherine Faulders et al., *Newly Appointed U.S. Attorney Will Attempt to Charge James Comey Despite Prosecutors Finding No Probable Cause*, ABC News (Sept. 24, 2025), https://perma.cc/F8AB-2J7M ..........................................................26

**Other Sources**

23 Op. O.L.C. 60 (1999) .................................................................................11

*Black's Law Dictionary* (12th ed. 2024) .......................................................21

*Eastern District of Virginia*, U.S. Dep't of Justice (last visited Sept. 26, 2025), https://perma.cc/2BZ8-ZQ2F ...............................................26

GAO-01-468R (2001), https://perma.cc/XV4G-KUT6 ...................................11

Indictment, *United States v. Comey*, No. 1:25-cr-272 (E.D. Va. Sept. 25, 2025), Dkt. 1 ...................................................................................26

U.S. Dep't of Just., Just. Manual § 9-2.010.................................................................36

U.S. Dep't of Just., Just. Manual § 9-2.030.................................................................36

## ARGUMENT

**I.    Mr. Essayli's service violates the Federal Vacancies Reform Act.**

The government concedes Mr. Essayli's ineligibility under two of the FVRA's three provisions for naming acting officers: only 5 U.S.C. § 3345(a)(1) is "at issue here." Resp. 6; *see also* Mot. 28–35.[1]  *Giraud* correctly found the government's subsection (a)(1) arguments fatally atextual and ahistorical.  The government never explains why that decision was wrong, and it fails to confront the extraordinary implications of its statutory interpretation.

**I.A.    The government's entire FVRA argument hinges on the unfounded theory that it can designate an acting officer by backfilling the first assistant position.**

The government agrees Mr. Essayli was not first assistant when the vacancy occurred.  Resp. 2–3, 6.  Its subsection (a)(1) argument therefore turns on whether the government can backfill a vacant office by designating its choice as first assistant *after* the vacancy occurred.  Resp. 6–9.

The government appears not to have identified a single case even indirectly supporting any step of its statutory analysis.  *See id.*  The lone cited opinion is *Giraud*—which thoroughly rejected the same arguments.  Resp. 6 n.3.  It instead relies on interpretations by Department of Justice and Government Accountability Office officials.  Resp. 8.

The government does not disclose that both those opinions contradicted

---

[1]  Citations to the motions refer to *Garcia*, Dkt. 21, No. 2:25-cr-655-MEMF.

views the same agencies announced in other opinions around the same time.  *See* 23 Op. O.L.C. 60, 63–64 (1999); GAO-01-468R, at 2 (2001), https://perma.cc/XV4G-KUT6.  Opinions by the Department and GAO are entitled to "no deference," and they are hardly persuasive given their shifting views.  *See Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016).

### I.B.    The backfilling theory is wrong.

#### I.B.1.    The government cannot trigger a present-tense statute with a past-tense resignation.

The government focuses on the present-tense nature of § 3345(a)(1).  Resp. 6–8.  The parties agree subsection (a)(1) is a "default rule" that is "automatic and present-tense."  Resp. 8.  An officer "resigns" or "dies" in the present tense.  In that present moment, the first assistant is automatically elevated.

But the present tense is of no help to the government.  When Mr. Essayli became first assistant in July, the only resignation that could have triggered his elevation under subsection (a)(1) was six months in the past.  Mot. 31–34.[2]

Despite carrying the banner for the present tense, the government's maneuver only works if the statute is rewritten into the past or present-perfect.

---

[2]  The government's arguments do not rely on Mr. Essayli's purported resignation in July, so the defense agrees the Court need not resolve the motions' arguments in that regard.  *See* Mot. 31–33; Resp. 9 & n.5.  But should the Court find Mr. Essayli's service valid under the FVRA, that issue will ripen when the FVRA clock expires in November, and disqualification will be necessary if Mr. Essayli continues to serve.

For example, a statute that applied if an "officer … *has* died, resigned, or otherwise become unable to perform" might activate indefinitely, such that it could elevate a later-hired first assistant. *See Giraud*, 2025 WL 2416737, at *14 n.159 (contrasting present and present-perfect). But that is not what Congress drafted. *See Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 775 (9th Cir. 2008) ("[U]se of the present tense in defining 'Indian lands' unambiguously prescribes that title to the real estate must *already* be held … in trust for a tribe.").

The government asserts, without citation, that a "vacancy is a continuing thing." Resp. 8. But again, a "continuing thing" exists in the present-perfect tense, not the present. Nor is that how Congress deployed "vacancy" in the FVRA, which repeatedly uses "vacancy" to mean an event that "occurs" in a present, "immediate" moment, on a single "date," and is then consigned to the past as having "occurred." 5 U.S.C. §§ 3346(a)(1), (c), 3348(a)(2)(B)(ii), 3349(a)(1).

### I.B.2. The backfilling theory defies the FVRA's structure.

**If-then structure without a Presidential trigger.** Subsection (a)(1)'s present-moment nature is also reflected in its if-then structure: *if* an official resigns, *then* "the first assistant" is automatically elevated. "*The*" first assistant— the one who already exists and can do the job immediately, whom Congress designated in advance in case of emergency. There is "no textual indication that the President has any choice in invoking the first-assistant provision, nor that it is meant to trigger at any time other than the moment the vacancy occurs." Mot. 30

*UNITED STATES v. GARCIA & RAMIREZ*                                                    REPLY – 12

(quoting *Giraud*, 2025 WL 2416737, at *14).

The government has no response on this structural point. Its analysis never mentions the FVRA cases that reinforced *Giraud*'s conclusion. *See* Mot. 29 (citing *L.M.-M. v. Cucinelli*, 442 F. Supp. 3d 1, 28 (D.D.C. 2020)); *Giraud*, 2025 WL 2416737, at *15– & nn.161–69 (citing *L.M.-M.* and *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 303–04, 310 (2017)). And it never explains why Congress chose automatic, mandatory language in subsection (a)(1) if what it meant to do was grant the executive a non-automatic, non-mandatory option it can trigger at whatever future time it chooses. That choice would be especially puzzling given subsections (a)(2) and (a)(3), where Congress knew how to let the President control the timing.

**Backward-looking requirements.** The government urges the Court to reject a "backward-looking eligibility requirement" for subsection (a)(1), because Congress knew how to draft such a requirement, as in § 3345(a)(3), (b)(1)(A). Resp. 7. The government again confuses past and present. Subsection (a)(1) elevates whoever is first assistant in the *present* moment when the vacancy occurs; it never looks backwards. Ironically, it is the government who urges an atextual, backward-looking inquiry, asking whether an official died or resigned in the *past*, prior to a first assistant's hiring.

**"First assistant to the office."** The government points out that subsection (a)(1) applies to "the first assistant *to the office* of such officer." Resp. 7. Without analysis or citation, it then jumps straight to the conclusion that the statute does not require the temporary official to have served "at any

*UNITED STATES v. GARCIA & RAMIREZ*                                    REPLY – 13

particular time." *Id. Giraud* debunked that view with thorough analysis the government never addresses. 2025 WL 2416737, at *16.

The government's "argument fails textually," because "'office of such officer' can just as easily be read as a definition" for "a term of art which refers to the agency's formal hierarchical structure." *Id.* Otherwise, vacancies would invite litigation over who was genuinely the "first" assistant. The deputy on whom "the outgoing officer relied most heavily"? *Id.* The deputy hired earliest? The principal administrative assistant? Congress chose a definitive answer, relying on the organizational chart. That choice did not change the present-moment nature of subsection (a)(1).

**Superfluity.** The government concedes its sweeping view of subsection (a)(1) would eliminate subsections (a)(2) and (a)(3) in virtually all situations. *See* Resp. 8; Mot. 30. It identifies just two scenarios where it says those provisions could have effect. Resp. 8–9. Neither defeats the superfluity canon.

*First*, the government says the President might use subsection (a)(2) or (a)(3) when the first-assistant role is vacant and requires confirmation. *Id.* But under the government's backfilling theory, that need never happen: the agency head could just name her choice as the first assistant's first assistant, to be automatically elevated two levels to the top job. Even if this scenario were plausible, it "will undoubtedly be 'unusual,'" and the superfluity canon applies even if the provision in question still has effect in rare circumstances. *Giraud*, 2025 WL 2416737, at *16; *accord TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001).

*Second*, the government says subsections (a)(2) and (a)(3) "play a distinct role when the President wants to leave the current first assistant in place … e.g., because the … first assistant is the best suited to perform the important second-in-command functions." Resp. 9. That scenario is not just unusual: it contradicts the premise of subsection (a)(1). Congress chose first assistants as the default precisely because they are presumed best qualified to step into command on a moment's notice. It is fantastical to think Congress added subsections (a)(2) and (a)(3) to *avoid* elevating existing first assistants who are *too good* at their jobs.

With structure in mind, "[t]he defendants' reading creates far more harmony between the FVRA's provisions than the Government's reading, which would find a major loophole in subsection (a)(1) permitting an end-run around every one of the limitations included in subsections (a)(2) and (a)(3) in most instances." *Giraud*, 2025 WL 2416737, at *16.

### I.B.3.    The backfilling theory thwarts the FVRA's purpose.

The legislative history and purpose "confirm[] what the text makes clear." *Id.* at *18. The Senate report on the FVRA "clearly contemplates that the first assistant provision only functions in its automatic form at the moment the vacancy occurs, and does not repeat, and suggests that the President has no role in that process." *Id.* at *18 nn.179–83 (citing S. Rep. No. 105-250, at 12–15, 31, 35 (1998)). The motions raised that history, Mot. 29 n.26, but the government just ignores this extensive evidence undercutting its views. It never even mentions legislative purpose or history.

Instead, the response offers a policy argument: under the defense's

interpretation, "§ 3345(a)(1) would be less useful as an automatic default rule." Resp. 8. Apparently, this is because it would hamstring the ability of agency heads to name and elevate a new first assistant "so the President does not have to personally fill" every vacancy. *Id.* There are three problems with the government's policy logic.

*First*, the government is not describing an "automatic default" application of § 3345(a)(1) at all. It is not automatic because, following a vacancy, it depends on the agency head's decision to name a new first assistant—which may never transpire. It is not default, because there is no pre-identified official; the agency head may choose anyone.

*Second*, the government is incorrect that the President "*ha[s]* to personally fill" every vacancy under the defense's interpretation. Subsection (a)(1) does so automatically. The President is burdened only if he wants to deviate from that default.

*Third*, the government is trying to protect the "useful[ness]" of a power Congress deliberately eliminated with the FVRA. As *Giraud* chronicled, the Senate explicitly intended that "[i]f there is no first assistant, no one is permitted by law to become an acting officer" except through the *other* subsections. 2025 WL 2416737, at *17 (quoting S. Rep. No. 105-250, at 13).

The government's argument accidentally demonstrates that it seeks the opposite of the result Congress intended. Congress did not want agency heads involved in filling vacancies at all, so it excluded them in both paths: automatic elevation and designation by "the President (and only the President)." 5 U.S.C.

*UNITED STATES v. GARCIA & RAMIREZ*                                                            REPLY – 16

§ 3345(a)(2), (a)(3). That § 3345(a)(1) would be "less useful" to agency heads—indeed, not useable at all—was the whole point.

The FVRA was a reaction to executive overreach, including the administration's contention that roles requiring confirmation—Department of Justice roles specifically—could be filled by means outside the Vacancies Act. *Giraud*, 2025 WL 2416737, at *18. Congress rejected that position as "wholly lacking in logic, history, or language," and it enacted the FVRA to foreclose it. *Id.* (quoting S. Rep. No. 105-250, at 3). Congress thus "severely limited the options for who may perform the functions and duties" of a vacant office. *Id.* The Court should not interpret the FVRA as having inadvertently broadened the options Congress meant to limit severely.

### I.B.4.    The Court should resolve any ambiguity to avoid constitutional doubt.

The government argues that, on the merits, there is no Appointments Clause violation. Resp. 15–16. But it does not even mention the motions' arguments about constitutional avoidance. *See* Mot. 34–35. Nor does it dispute that the novelty of its interpretation—and the lack of historical support—is "[p]erhaps the most telling indication of a severe constitutional problem." Mot. 35 (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 220 (2020)). If the Court concludes the FVRA is ambiguous, it should adopt the defense's interpretation and avoid confronting that severe problem.

**I.C.      The special-attorney theory violates the FVRA's limits, including § 3347.**

The government makes a stunning alternative argument: Mr. Essayli can continue to perform the functions and duties of the U.S. Attorney indefinitely, by delegation from the Attorney General to him in his capacity as special attorney. Resp. 11–15.  There are no eligibility requirements and no expiration date. Congress squarely rejected that approach when it enacted the FVRA, and the government's analysis "crashes headlong" into the FVRA's unambiguous limits. *Giraud*, 2025 WL 2416737, at *22.

**I.C.1.      The special-attorney theory fails at the outset because there has been no lawful special-attorney appointment or delegation.**

The Court need not address this special-attorney theory on the merits, because it fails at the outset for two independent reasons.

*First*, the statute invoked for Mr. Essayli's appointment as "special attorney to the Attorney General" does not authorize the Attorney General to appoint anyone to anything.  *See* Resp. 12 & Exs. 3–4 (citing 28 U.S.C. § 515).  Its text is phrased in the past tense to apply to attorneys who have already been "appointed by the Attorney General under law," 28 U.S.C. § 515(a), or "retained under authority of the Department of Justice," *id.* § 515(b).  "[R]ead plainly, [it] is a logistics-oriented statute that gives technical and procedural content to the position of already-'*retained*' 'special attorneys.'"  *United States v. Trump*, 740 F. Supp. 3d 1245, 1267 (S.D. Fla. 2024), *appeal dismissed*, No. 24-12311, 2025 WL

2017539 (11th Cir. Feb. 11, 2025).

*Second*, there is no evidence of any Attorney General delegation of *any* power to Mr. Essayli as special attorney. She named Mr. Essayli to that role, but only a human-resources manager purported to delegate any powers to him in that capacity. Resp. Exs. 3–4. Actions taken as special attorney were therefore unauthorized by any lawful delegation.

### I.C.2.    Congress enacted the exclusivity provision at § 3347 to nullify this exact delegation argument.

Congress anticipated administrations might try to use agency delegation to bypass the FVRA. In adding § 3347(b), Congress was reacting to the exact argument about Department of Justice delegation that the government now wants to resurrect. Per the Senate committee:

> Specifically, the Department of Justice maintains that where a department's organic act vests the powers and functions of the department in its head and authorizes that officer to delegate such powers and functions to subordinate officials or employees as she sees fit, such authority supersedes the Vacancies Act's restrictions on temporarily filling vacant advice and consent positions, allowing for designation of acting officials for an indefinite period, even without submitting a nomination to the Senate to fill the position on a permanent basis.

S. Rep. No. 105-250, at 3; *accord Giraud*, 2025 WL 2416737, at *22 n.223 (collecting legislative history). The Senate even called out two of the statutes the government cites for its delegation maneuver, Resp. 11–12, explaining that the FVRA "forecloses the argument raised by the Justice Department that sections 28 U.S.C. §§ 509 and 510, rather than the Vacancies Act, apply to vacancies in that

*UNITED STATES v. GARCIA & RAMIREZ*                    REPLY – 19

department," S. Rep. No. 105-250, at 17.

Section 3347 "was enacted for the *express purpose* of precluding the *exact argument* that the Government presses here," *Giraud*, 2025 WL 2416737, at *22, as the Department of Justice "informally" acknowledged at the time, S. Rep. No. 105-250, at 10.  Approving the government's special-attorney theory now would undo that deliberate reform.

### I.C.3.    The special-attorney theory flouts § 3347's text.

Congress did not merely voice its disagreement: it "manifested that rejection in section 3347(b)."  *Giraud*, 2025 WL 2416737, at *22.

Section 3347 has two relevant parts.  First, it sets the FVRA as "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" requiring confirmation, *id.* § 3347(a), unless there is some other vacancy statute applicable to "a specified office," *id.* § 3347(a)(1)(A), (B).

But second, Congress made sure to close the asserted delegation loophole.  Section 3347(b) responds directly to that theory:

> Any statutory provision providing general authority to the head of an Executive agency … to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency, is not a statutory provision to which subsection (a)(1) applies.

The upshot is that an agency's delegation authority is *not* one of the mechanisms that can be used under § 3347(a)'s exception to the FVRA's exclusivity.  If an administration wants to select someone to perform an office's

*UNITED STATES v. GARCIA & RAMIREZ*                                    REPLY – 20

functions and duties temporarily, it must use the FVRA or a position-specific statute. It cannot just cobble all those functions and duties together by delegation. *Giraud*, 2025 WL 2416737, at *21.

But that is precisely what the government contends was done here. *Contra supra* 19 (no delegation by Attorney General). Faced with an identical wholesale delegation, *Giraud* easily concluded that it violated § 3347—which the government fails to mention. 2025 WL 2416737, at *21–22.

### I.C.4.    A special attorney cannot bypass § 3347 by claiming he is not the "acting official."

The government suggests the special-attorney theory complies with the FVRA because Mr. Essayli's designation "does not empower him to be the 'acting official.'" Resp. 13. Rather, the government says, the Attorney General merely "*delegates* to him" all the functions and duties such an official would have. Resp. 13. "Essentially, it suggests that what it admittedly cannot achieve in name, it can do in practice." *Giraud*, 2025 WL 2416737, at *23.

To start, it is not clear what daylight the government sees between *being* the acting official and *performing* all that official's powers. The common-sense answer is that there is none. After all, "acting" and "performing" are synonyms. *E.g.*, *Officer*, *Black's Law Dictionary* (12th ed. 2024) (defining "acting officer" as "[o]ne performing the duties of an office").

An official's authority is what matters, not the title. Congress likely expected administrations would try to evade the FVRA on technicalities like creative labeling. So rather than have § 3347 turn on an official's title, it turns on

*UNITED STATES v. GARCIA & RAMIREZ*                                                REPLY – 21

the powers he has been granted. If an official is to be authorized "to perform the functions and duties" of an office, regardless of title, then the FVRA is "the exclusive means" and bars the use of agency delegation to achieve that result. 5 U.S.C. § 3347(a).

Although § 3347(a) refers to "authorizing an acting official," that does not mean it only applies when "acting" appears in the official's title. *Giraud* analyzed the text and structure and concluded "acting official" is "not a term of art" or otherwise defined. 2025 WL 2416737, at *23. Instead, the "common understanding" of "acting" captures any performance of an office's functions by someone other than the officeholder. *Id.* That is "exactly what [Mr. Essayli] is doing, regardless of [his] technical title." *Id.* *Giraud* further explained that "the Government's strict reading of 'acting' would render section 3347(b) surplusage." *Id.* at *24. Again, however, we are not told what the government thinks of *Giraud*'s analysis. *See* Resp. 13.

### I.C.5. The government conflates the exclusivity provision at § 3347 with the ratification bar at § 3348.

The government's delegation theory rests on the misguided claim that § 3347 permits it to use delegation to designate a temporary official with all a vacant office's functions and duties—so long as those powers are not exclusive to the office. To get that result, the government blurs together two distinct provisions of the FVRA. *See* Resp. 13–15. The first is the exclusivity provision just discussed. 5 U.S.C. § 3347. The second is the ratification bar, which prohibits a later, properly appointed official from ratifying certain actions of an

prior, improperly appointed one. *Id.* § 3348(d).

In identifying which actions are subject to the ratification bar, § 3348(a)(2) asks whether the action was a "function or duty" of the vacant office. And for § 3348 only, the FVRA establishes "function or duty" as a term of art, defined to include only those powers required by statute or regulation to be "performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A)(ii), (a)(2)(B)(i)(II).

Although the government never explains its textual logic, it appears to be taking that narrow definition from § 3348 and applying it to § 3347. With that transplant, the government narrows the effect of § 3347 dramatically, applying only when a temporary official is performing *exclusive* functions and duties. *See* Resp. 13. Because Mr. Essayli purportedly performs only non-exclusive powers, § 3347 would be inapplicable. *Id.*

There are two glaring problems with the government's transplanted definition. First, § 3348(a)'s definitions apply only "[i]n this section," not in § 3347. Second, the term of art defined at § 3348(a)(2), "function or duty," does not appear anywhere in § 3347, which is phrased in terms of "functions and duties" but which does *not* define these as limited to exclusive powers.

Although those terms are facially similar, the FVRA makes clear they carry different meanings. The § 3348(a)(2) definition of "function or duty" captures "any function or duty" meeting certain criteria. That means the defined term "function or duty" *must* be a smaller subset of all "functions and duties," lest the definition be circular and meaningless.

*UNITED STATES v. GARCIA & RAMIREZ*                                      REPLY – 23

One subsection later, § 3348(b) uses both terms for different purposes. That contrasting usage in a single subsection triggers an extra-strong presumption that different terms mean different things. *Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021) (en banc). The Court should reject the government's attempt to avoid § 3347 with an inapplicable definition of a different term from a different section.

### I.C.6.    The government's conflation of §§ 3347 and 3348 leads it to mischaracterize the case law.

The government asserts that "[e]very court of appeals to consider the issue—including the Ninth Circuit—has agreed" with its interpretation. Resp. 13. But only one of the cited cases addressed § 3347, "the issue" presented here; the others all analyzed § 3348. The § 3348 cases can only be said to have "considered the issue" here if one has *already* accepted the government's argument conflating those sections. Relying on those cases to support that very argument is therefore circular and misleading.

*Gonzales*, the cited Ninth Circuit case, neither "considered" nor "agreed" with the government about the meaning of "functions and duties" in § 3347. Resp. 14–15 (citing *Gonzales & Gonzales Bonds & Ins. Agency v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024)). It expressly limited its analysis to § 3348, noting that § 3347(b) "does not impact the meaning of 'function or duty' in § 3348"; rather, § 3347(b) "answers a question wholly distinct" from the one in *Gonzales*. 107 F.4th at 1078. If anything, *Gonzales* suggested that it was inclined to *disagree* with the conflation the government urges here, noting that

§ 3347(b) could be broader than § 3348's ratification bar. *Id.* at 1078–79 ("[W]ho is authorized to act and the various consequences of an unauthorized person's actions are not necessarily congruent….").

In *Arthrex*, the Federal Circuit did adopt the government's view of § 3347. *See* Resp. 13–14 (citing *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328 (Fed. Cir. 2022)). But its decision contained two major and material mistakes.

First, in quoting § 3348's definition, *Arthrex* omitted the crucial "in this section" phrase. 35 F.4th at 1335. *Arthrex* thus never even considered that § 3348's "definition might be limited to only that section"—which, of course, is exactly what § 3348 says. *Giraud*, 2025 WL 2416737, at *25. Second, *Giraud* observed that *Arthrex* appears to reflect a structural misunderstanding about what § 3347(b) does. *Id.* Having misunderstood an incomplete version of the statutory text, "*Arthrex* is not persuasive." *Id.*

The government's two remaining cases are irrelevant. *See* Resp. 14–15 (citing *Kajmowicz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022); *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132 (2d Cir. 2009) (per curiam)). Like *Gonzales*, neither addressed the § 3347 issue here. *Giraud*, 2025 WL 2416737, at *25 & n.251.

### I.C.7.   The special-attorney theory would unravel the FVRA.

The government does not explain the limits of the special-attorney theory. There do not appear to be any. The Attorney General can choose any individual she likes for such an appointment, regardless of FVRA eligibility. Mr. Essayli's

appointment to that role has no expiration date, and neither would a delegation of U.S. Attorney powers (had there been a lawful delegation here). *See* Resp. Exs. 3–4.

If the special-attorney theory is correct, it is not clear why the Department of Justice would bother complying with the FVRA going forward. Worse still, why would an administration ever seek confirmation for sub-Cabinet officials, if it can achieve the same result by delegation?

This threat is not speculative. The motions described the pattern of FVRA violations and special-attorney appointments across five judicial districts. Mot. 15–22. Just this week, the administration added a sixth district, naming an FVRA-ineligible lawyer as the new U.S. Attorney for the Eastern District of Virginia.[3] Not "acting," not "interim." She is presenting herself (and yesterday personally signed an indictment) as *the* "United States Attorney."[4]

Nor is there reason to think it will be contained to the Department of Justice. In rejecting the Department's delegation theory, Congress explained that it was "broadly applicable to virtually all other departments" given the prevalence of delegation statutes. S. Rep. No. 105-250, at 5. The Court should not approve the government's attempt to restore the very tactic Congress feared and legislated

[3] Katherine Faulders et al., *Newly Appointed U.S. Attorney Will Attempt to Charge James Comey Despite Prosecutors Finding No Probable Cause*, ABC News (Sept. 24, 2025), https://perma.cc/F8AB-2J7M.

[4] *E.g.*, Indictment 2, *United States v. Comey*, No. 1:25-cr-272 (E.D. Va. Sept. 25, 2025), Dkt. 1; *Eastern District of Virginia*, U.S. Dep't of Justice (last visited Sept. 26, 2025), https://perma.cc/2BZ8-ZQ2F.

to prevent.

## II.      Mr. Essayli has exhausted the 120-day clock at 28 U.S.C. § 546(c)(2).

Even if Mr. Essayli's service complies with the FVRA, it still violates the 120-day limit at 28 U.S.C. § 546(c)(2).

**Text.**  The government cannot dispute that the plain text of § 546 applies. *See* Mot. 37.  In April, Mr. Essayli was "appointed as United States attorney under this section." *Id.* § 546(c).  He therefore "may serve" no later than "120 days after appointment." 28 U.S.C. § 546(c)(2).  So the government goes searching for some reason to jettison § 546(c)(2) other than its text.

The government argues § 546 is not "the 'exclusive' means of temporarily authorizing service as an acting official"; the FVRA "still is available." Resp. 10 (emphasis omitted).  No one argues otherwise: the motions assumed both options are available for making a designation.  Mot. 37.  The question is when that designation must end.

The government assumes that if it makes an FVRA designation, the 120-day clock no longer applies.  But neither statute says anything like that.  As the motions argued, the statutes should be read to "exist side-by-side." Mot. 38.  To the extent there is conflict, the newer, more specific statute–§ 546(c)(2)–controls. Mot. 38–39.  The government's argument subverts that traditional approach to statutory analysis.  Rather than effectuate the statutes side-by-side, the government argues that the older, more general statute's time limits should apply *to the exclusion* of the newer, more specific limit.  Where both provisions can be

read to have effect, the Court should do so.

Congress could have written § 546(c)(2) to embrace the government's theory.  For instance, the statute could have set "the term of an appointment under this section" at 120 days directly.  Instead, it chose to track the "person appointed" and to limit that person's "serv[ice]."  Congress thus ensured the 120-day clock would have force even if an administration later tried to extend that service with some additional designation.

**Superfluity of § 546(d).**  The government does nothing to address concerns that its view would render superfluous the district court's appointment authority at § 546(d).  *See* Mot. 39–43.  Instead, its argument underscores the superfluity.

The government says there "have been many times" when "the Executive Branch has allowed" a district court's § 546(d) appointment.  Resp. 11.  That is the problem: the current maneuvers deviate from that historical approach, raising separation-of-powers red flags.  *See Seila Law*, 591 U.S. at 220.

The government makes no effort to explain how its *current* theory leaves any room for § 546(d).  *See* Resp. 10–11.  Its theory means the Attorney General can appoint someone for 119 days under § 546(a), then switch the appointment to the FVRA, and then perhaps switch back when the FVRA clock expires, and so on, evading each statute's time limits indefinitely.  If so, § 546(d) would be "dormant in all but the most unlikely situations."  *TRW*, 534 U.S. at 31.  Such a result forecloses the government's interpretation, especially given § 546(c)(2)'s separation-of-powers underpinnings.  Mot. 40–43.

*UNITED STATES v. GARCIA & RAMIREZ*                                    REPLY – 28

**Mischief.** The government does not dispute the motions' account of the mischief that prompted § 546(c)(2)'s enactment. *See* Mot. 44–48; Resp. 11. Nor can it dispute the canon that statutes should be interpreted to prevent such mischief. *See* Mot. 44; Resp. 11.

The government's response is that the mischief behind § 546(c)(2) "has nothing to do with the FVRA." Resp. 11. But the Court is being asked to apply § 546(c)(2), so the mischief that prompted it is absolutely relevant. The government's argument echoes the one Senator Leahy condemned once both statutes were in the books—including his warning that administrations would misuse the statutes sequentially, switching from one to the other to evade the time limits in both. Mot. 48.

## III. Mr. Essayli's service violates the Appointments Clause.

If the government's statutory interpretations are correct, then Mr. Essayli's service is incompatible with the Appointments Clause. Especially following the Supreme Court's *Arthrex* decision, U.S. Attorneys are principal officers requiring confirmation. Mot. 49–53; *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021). The same is true of temporary U.S. Attorneys, if the government's unbounded appointment theories are approved. Mot. 53–55. At the very least, the constitutional doubt that permeates the government's interpretations further supports rejecting them.

The government does not address the motions' analysis under the many factors identified in *Morrison* and *Edmond*. *See* Mot. 50 (citing *Morrison v.*

*UNITED STATES v. GARCIA & RAMIREZ*                    REPLY – 29

*Olson*, 487 U.S. 654 (1988); *Edmond v. United States*, 520 U.S. 651 (1997)).[5] Instead, it focuses on a single factor: that U.S. Attorneys' decisions are purportedly "supervised and can be reversed by the Attorney General and the Deputy Attorney General." Resp. 16. It then invokes *Arthrex*, saying the Supreme Court categorized patent judges as principal officers "because they possessed unreviewable authority to make decisions on behalf of the agency," whereas U.S. Attorneys do not. *Id.*

The government completely ignores the one factor the Supreme Court has consistently found significant: removal. *See* Mot. 50–51. Indeed, *Arthrex* relied on the fact that the agency head could not remove patent judges without cause, 594 U.S. at 16–17, 22–23, but the government's account of *Arthrex* misleadingly omits that, *see* Resp. 16. Unlike patent judges, U.S. Attorneys cannot be removed by the agency head (the Attorney General), even for cause. 28 U.S.C. § 541(c).

Regardless, supervision is not determinative, and not all supervision is alike. The *Arthrex* patent judges were subject to substantial supervision—including as to case initiation, assignment, and reassignment—but there was still an Appointments Clause problem. Mot. 52–53 (citing 594 U.S. at 15–17). Under that holding, *Gantt*'s conclusion that U.S. Attorneys are inferior would have come

_____

[5] The government says that the defense "overlooks *Myers*" and its statement that U.S. Attorneys are inferior officers. Resp. 16 (citing *Myers v. United States*, 272 U.S. 52, 159 (1926)). But the motions indeed cited *Myers* and explained that its remark about U.S. Attorneys—in an opinion about postmasters—was dicta. Mot. 50 n.42; *see also In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 642 (D.D.C. 2018) (identifying *Myers*' statement as "dicta").

out the other way, because it relied on similar supervisory functions like reassignment, salary, and expense reimbursement. *Id.* (citing *United States v. Gantt*, 194 F.3d 987, 999-1000 (9th Cir. 1999), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499, 506 (9th Cir. 2008) (en banc)).  Like the government here, *Gantt* erroneously gave no weight to the fact that U.S. Attorneys are not removable by the agency head.  194 F.3d at 1000.

There is also reason to be skeptical about the government's claim that U.S. Attorneys are sufficiently supervised because they "can be reversed." Resp. 16.  The government neither cites anything for that factual proposition, nor explains how it works in practice.  If Mr. Essayli signs an indictment or a plea agreement, can the Attorney General "reverse" that action?  No, he has bound the agency.  Perhaps she could order him to move to dismiss the indictment or move to withdraw from the agreement, but only a court could "reverse" the action and un-bind the agency.  Similar after-the-fact supervision mechanisms *Arthrex* were much more robust—but still insufficient to confer inferior-officer status.  *See* 594 U.S. at 15–17.

Nor is Mr. Essayli's designation constitutional because he is a temporary official.  *See* Resp. 15–16.  The principle that temporary officials are inferior presumes that the official is serving "for a limited time, and under special and temporary conditions."  Mot. 53 (quoting *United States v. Eaton*, 169 U.S. 331, 343 (1898)).  The government's theories would permit Mr. Essayli to exercise the full powers of the U.S. Attorney indefinitely.  There is nothing limited, special, or temporary about that.

*UNITED STATES v. GARCIA & RAMIREZ*                                        REPLY – 31

**IV.    The Court should remedy Mr. Essayli's unlawful actions and supervision.**

> **IV.A.    Criminal defendants do not need civil standing to challenge a prosecution.**

The government puzzlingly argues defendants must establish *civil* standing in order move to dismiss their *criminal* case or disqualify a prosecutor.  Tellingly, it found no criminal cases to support that idea.  *See* Resp. 19–20.  And although the government concedes that standing rules apply to "a plaintiff," it never acknowledges *the government* is the plaintiff here.  Resp. 19.  Even in civil cases, the proposition is absurd: a defendant does not need standing to move to dismiss a complaint.  His "standing" is the fact he was dragged into court in the first place.

To the extent some redressable injury is required, it is undoubtedly present here: the indictments jeopardize the defendants' liberty and civil rights—indeed, Mr. Garcia is presently in custody—and granting the motions would extinguish that jeopardy.

> **IV.B.    The Court should void and dismiss the indictment with prejudice.**

**Voiding.**  Before requesting dismissal, the motions first argued the Court should declare the indictments void.  Mot. 55–56.  The government does not even mention this request, much less oppose it; the word "void" appears nowhere in the response.  "Failure to respond to an argument set forth in a motion to dismiss constitutes waiver of the issue by the party opposing the motion and is an adequate basis for granting the motion to dismiss."  *Green v. Ariz. Bd. of Regents*,

No. CV-18-4665, 2020 WL 2512759, at *4 (D. Ariz. May 15, 2020) (collecting cases); *accord Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005).  To the extent the government has arguments against declaring the indictment void, it has waived them and denied the defense the opportunity to reply.  The Court should grant this uncontested remedy.

**Dismissal.**  The motions explained that dismissal is the appropriate remedy under *Bundy*, *Trump*, and § 3348(d)(1)'s ratification bar, among other authorities. Mot. 56–61 (citing 28 U.S.C. § 3348(d)(1); *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020); *Trump*, 740 F. Supp. 3d 1245).

The government ignores that analysis.  It never even mentions *Bundy* and references *Trump* only as to Mr. Rojas's separate appropriations argument.  *See* Resp. 19 n.10.  The government has waived any argument against dismissal under *Bundy*, which authorizes that relief in order to "implement a remedy" for the statutory and constitutional violations, to "preserve judicial integrity," and to "deter future illegal conduct."  *See* Mot. 56 (citing *Bundy*, 968 F.3d at 1030).  All three of those grounds cry out for dismissal here.

The government misapprehends the relief the defense seeks.  It focuses on the assistant U.S. Attorneys' signatures on the indictments and opposes dismissal under Federal Rules of Criminal Procedure 7 and 12.  Resp. 17–19.  But the motions made clear this case is not about a mere Rule 7 defect.[6]  Mot. 58 n.44.

---

[6]  The government is wrong, at any rate, that the indictments are not defective. *See* Resp. 17.  The assistant U.S. Attorneys who signed them did so under Mr. Essayli's name and pursuant to his purported authority as "Acting

The motions also explained that district courts have the authority to dismiss, above and beyond Rule 12, including when the "exercise of prosecutorial power has not been authorized by law." Mot. 56 (quoting *Trump*, 740 F. Supp. 3d at 1302). The government does not respond. By focusing on Rule 7, and ignoring *Bundy* and *Trump*, the government misses the boat.

The government's cited cases do not foreclose dismissal here. *Gantt* and *Hilario* addressed remedies for defective appellate certificates and notices, not remedies for indictment and on-going prosecution by an unauthorized official. *See* Resp. 17 (citing *Gantt*, 194 F.3d at 998; *United States v. Hilario*, 218 F.3d 19, 22 (1st Cir. 2000)). The other cases in the government's string cites either (1) address the relief available under different authorities than invoked here or (2) are inapposite because the defendants had agreed, by concession or waiver, that they were indicted by lawfully appointed U.S. Attorneys. *See* Resp. 18–19.

In dicta, *Gantt* opined that an unconstitutional appointment "would not affect the validity of indictments, … as indictments need only be signed by an 'attorney for the government.'" 194 F.3d at 998. But the validity of the indictment was not challenged in *Gantt*, and its comment about indictments did not factor into the issue actually decided—the validity of appellate certificates under 28 U.S.C. § 3731. *Id.* That comment was therefore not "germane" to *Gantt*'s resolution, as the government contends, Resp. 17 n.9, and it does not bind this Court, Mot. 58 n.44.

---

U.S. Attorney." *Garcia* Dkt. 13, at 5; *Ramirez* Dkt. 1, at 5. That they *could have* done so under their own names or the Attorney General's is immaterial.

The government further mischaracterizes the requested remedy when it argues "there is no due process right to choose one's prosecutor."  Resp. 19.  No one is asking to choose their own prosecutor.  Instead, the defense asks the government and this Court to make good on "a basic constitutional promise essential to our liberty": that criminal prosecutions be conducted only by lawfully authorized prosecutors.  *Donziger v. United States*, 143 S. Ct. 868, 870 (2023) (Gorsuch, J., dissenting from denial of cert.); *see also* Mot. 59 & n.46 (collecting cases); *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807–80 (1987) (imposing "requirement of a disinterested prosecutor" under "supervisory authority").  When the "exercise of prosecutorial power has not been authorized by law," dismissal must follow.  Mot. 56 (quoting *Trump*, 740 F. Supp. 3d at 1302).

**Dismissal with prejudice.**  The motions argued that dismissal should be with prejudice.  Mot. 59–61.  "No lesser remedy" would redress the past and future harms to the defendants and deter the government's ongoing unlawful conduct.  Mot. 59–60.  The government opposes dismissal, of course, but it says nothing about the nature of a dismissal if granted, and it never mentions "prejudice."  *See* Resp. 16–20.  It has thus waived any argument in favor of without-prejudice dismissal.

**Mr. Essayli's involvement in the prosecutions.**  The government says the defense has "offered no reason to believe that Mr. Essayli was personally involved in approving or filing the indictments in their specific cases, or … is in any way directing the prosecutions against them."  Resp. 20.  Mr. Essayli is front

and center in the indictments' signature block, so the government's assertion he is uninvolved raises more questions than it answers. *Cf.* Fed. R. Civ. P. 11(a)–(b); *Lake v. Gates*, 130 F.4th 1054, 1061 (9th Cir. 2025).

As the motions explained, "[a]ll actions that flowed from [the] defective appointment," including actions taken under Mr. Essayli's purported authority, "were unlawful exercises of executive power." Mot. 59 (quoting *Trump*, 740 F. Supp. 3d at 1303). The Justice Manual makes clear that approving investigations and prosecutions in each district is the U.S. Attorney's authority. U.S. Dep't of Just., Just. Manual §§ 9-2.010, 9-2.030. There is therefore at least a strong basis to believe Mr. Essayli was involved to that extent.

Should there be any doubt, the motions requested the Court order discovery as to prosecutorial approvals and Mr. Essayli's involvement. Mot. 58–59 (citing *Giraud*, 2025 WL 2416737, at *29–30). The government does not respond, waiving any opposition. If the Court believes more evidence of Mr. Essayli's role is necessary, it should order that evidence produced by the only party who possesses it.

**IV.C.    The Court should disqualify Mr. Essayli and his supervisees from participating in criminal proceedings in this district.**

The motions sought to disqualify Mr. Essayli "and any attorneys working under his supervision from participating in criminal prosecutions in this district." Mot. 61. The government does not address disqualification of Mr. Essayli on the merits, focusing exclusively on the assistant U.S. Attorneys. *See* Resp. 16–20. It

has therefore conceded that, if Mr. Essayli was not lawfully designated, he must be disqualified.

As to the assistants, the government again misunderstands the requested remedy. Its argument focuses on whether those attorneys have the "power to prosecute" and whether they "can continue prosecuting these cases." Resp. 16. And it marshals case law concerning whether a court can issue an "officewide disqualification." Resp. 18. No one actually disputes those issues: the defense clarified this during the parties' meet-and-confer and then again in the filed motions. *See* Mot. 62 ("[T]he defense does not suggest that they should be permanently disqualified from further participation.").

The issue is whether the assistants can continue to participate while their work is supervised by an unauthorized official. *Id.* (citing *United States v. Giraud* (*Giraud Aug. 1 Op.*), No. 1:24-cr-768, 2025 WL 2196794, at *9, 11 (D.N.J. Aug. 1, 2025)). They clearly cannot: disqualifying Mr. Essayli from participating in these cases means disqualifying him from *supervising* these cases, as well.

The case on which the government principally relies, *United States v. Williams*, is not to the contrary. Resp. 18 (citing 68 F.4th 564, 572 (9th Cir. 2023)). *Williams* addressed whether one assistant U.S. Attorney's alleged misconduct should be imputed horizontally to the entire office—not the vertical consequence of an unauthorized U.S. Attorney. 68 F.4th at 574. In that horizontal analysis, the Court held that it was "speculation to conclude that any conflict or misconduct pervaded the entire U.S. Attorney's Office." *Id.*

It requires no speculation to say that a disqualified U.S. Attorney cannot circumvent that disqualification by supervising the remaining attorneys' work on the cases.  If assistant U.S. Attorneys are acting under the supervision of an unauthorized official, the assistants' actions are "unlawful exercises of executive power."  *Trump*, 740 F. Supp. 3d at 1303; *see also Giraud Aug. 1 Op.*, 2025 WL 2196794, at *9–10.  Disqualifying assistants so long as they are supervised by Mr. Essayli is not an impermissible officewide disqualification.  It is a "targeted" remedy "based on the scope of … [the] violation."  *Giraud Aug. 1 Op.*, 2025 WL 2196794, at *10.  The government represents that the assistants are *also* supervised by "officials in Main Justice," Resp. 18, so the fix is an easy one: disqualify them until they are *only* supervised by lawfully appointed officials.

# CONCLUSION

The Court should void and dismiss the indictment with prejudice, and it should disqualify Mr. Essayli and his supervisees from participating in criminal prosecutions in this district.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: September 26, 2025     By:   */s/ James Anglin Flynn*
JAMES ANGLIN FLYNN
DREW HAVENS
AYAH A. SARSOUR
Deputy Federal Public Defenders

*Attorneys for Defendants*
*Ismael Garcia, Jr. &*
*Jaime Hector Ramirez*