AMY M. KARLIN (Bar No. 150016)
Interim Federal Public Defender
JAMES ANGLIN FLYNN (Bar No. 337608)
Email: james_flynn@fd.org
AYAH A. SARSOUR (Bar No. 340280)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, CA 90012-4202
Telephone: (213) 894-2854
Fax: (213) 893-0081

Attorneys for Defendant
JAIME HECTOR RAMIREZ

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>JAIME HECTOR RAMIREZ,<br><br>*Defendant*. | Case No. 5:25-cr-264-SSS<br><br>**Defendants' Reply in Support of Renewed Motion to Dismiss and to Disqualify**<br><br>Hearing Date: Oct. 13, 2026<br>2:00 p.m. |

## TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The Ninth Circuit rejected the government's stay argument, and this Court should do the same. ........ 2

I.A. The *Jackson* panel's order rejected this relief, and *Boyle* instructs this Court should follow that lead. ........ 2

I.B. The government has already told the Court to consider *Jackson*. ........ 4

I.C. The government cannot satisfy its burden to obtain a *Landis* stay—and does not try. ........ 5

I.D. Even if *Nken* applied, the government has not carried its burden. ........ 7

II. The wholesale delegation is invalid. ........ 8

II.A. The first-assistant delegation confers no powers. ........ 9

II.B. There is no seniormost-attorney doctrine. ........ 9

II.C. The special-attorney appointment confers no powers. ........ 11

II.D. The human-resources letter attempts a wholesale delegation that is invalid twice over. ........ 12

II.E. Essayli cannot exercise powers delegated to other attorneys. ........ 12

III. The July appointment and September delegation do not salvage Essayli's service. ........ 13

III.A. The July appointment does not validate Essayli's service. ........ 13

III.B. The September delegation is invalid. ........ 14

III.B.1. The September delegation is self-contradictory boilerplate. ........ 14

III.B.2. The September delegation violates the FVRA. ........ 15

IV. The Appointments and Apportionments Clauses also invalidate Essayli's service. ....... 16

V. The Court should disqualify Essayli from participating in or supervising this prosecution. ....... 17

VI. The Court should dismiss the indictment. ....... 18

VI.A. The trick. ....... 19

VI.B. The not-purporting. ....... 19

VI.C. The non-disclosure of the July order. ....... 20

VI.D. The response to *Jackson*. ....... 21

VI.E. The failure to pursue lawful means for filling the vacancy. ....... 22

CONCLUSION ....... 23

# TABLE OF AUTHORITIES

**Cases**

*Bullock v. U.S. Bureau of Land Mgmt.*,
489 F. Supp. 3d 1112 (D. Mont. 2020) .......... 15

*Edison Elec. v. City of Pasadena*,
178 F. 425 (9th Cir. 1910) .......... 16

*In re Grand Jury Subpoenas to the Office of the N.Y. Att'y Gen.*,
No. 26-156, 2026 WL 2450485 (2d Cir. Aug. 21, 2026) .......... 16

*In re Zermeno-Gomez*,
868 F.3d 1048 (9th Cir. 2017) .......... 3

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936) .......... 5, 6

*Lockyer v. Mirant Corp.*,
398 F.3d 1098 (9th Cir. 2005) .......... 7

*New Process Steel, L.P. v. NLRB*,
560 U.S. 674 (2010) .......... 16

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 5, 7, 8

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) .......... 3, 4

*United States v. Jackson*,
No. 25-6214, 2026 WL 2387099
(9th Cir. Aug. 17, 2026) .......... 1, 2, 3, 4, 5, 6, 8, 9, 11, 13, 14, 15, 18, 21

*United States v. Ramirez*,
807 F. Supp. 3d 1086 (C.D. Cal. 2025) .......... 11, 17, 18, 19

*United States v. Recinos-Valdez*,
No. 3:25-cr-10-MMD (D. Nev. Sept. 30, 2026) .......... 4, 5

*United States v. Trinidad Coal & Coking Co.*,
137 U.S. 160 (1890) .......... 15

*United States v. Villalonga*, 90 U.S. 35 (1874) .......... 15

*United States v. Wallace*, 213 F.3d 1216 (9th Cir. 2000) .......... 20

*United States v. Weyhrauch*, 544 F.3d 969 (9th Cir. 2008) .......... 20

*Widakuswara v. Lake*, 832 F. Supp. 3d 55 (D.D.C. 2026) .......... 16

*Yong v. INS*, 208 F.3d 1116 (9th Cir. 2000) .......... 6

**Statutes**

28 U.S.C. § 510 .......... 10

28 U.S.C. § 515 .......... 11, 14

28 U.S.C. § 542 .......... 14

5 U.S.C. § 3345 .......... 6

**Court Filings**

Government's Motion to Stay the Mandate and the Panel Judgment Pending Petition for Certiorari, *United States v. Jackson*, No. 25-6214 (9th Cir. Aug. 20, 2026), ECF No. 62 .......... 2, 3, 4

Memorandum for Charles Neil Floyd, *Rogoff v. Trump*, No. 2:26-cv-2566 (W.D. Wash. dated Sept. 25, 2026), ECF No. 42-3 .......... 6

Order, *United States v. Jackson*, No. 25-6214 (9th Cir. Aug. 21, 2026), ECF No. 63 .......... 2

**Other Sources**

Tracey Tully & Jonah E. Bromwich, "Inside the Crisis Gripping New Jersey's Federal Courts," *N.Y. Times* (Aug. 28, 2025)........................................8

Tracey Tully, "N.J. Criminal Cases Screech to a Halt as Habba's Authority Is Challenged," *N.Y. Times* (July 28, 2025) ..........................................................8

## INTRODUCTION

The government objects to the defense's characterization of its moving-target strategy in this case. Dkt. 74, at 12. It claims that its shifting positions have been merely "a good-faith attempt to advocate … while still complying with adverse decisions." *Id.*

Then, the government moves the target again, twice. First, there was apparently a July order by the Attorney General appointing Essayli as an assistant U.S. Attorney. Dkt. 74-2. The government inexplicably chose not to disclose that fact in its post-*Jackson* filing, Dkt. 66, even though Essayli's status as a non-AUSA has been an undisputed and material fact in this litigation, *e.g.*, Dkt. 59, at 9; Dkt. 68, at 14. Second, the Attorney General issued a new delegation to Essayli on the day the government filed its opposition. Dkt. 74-1.

None of this target-movement is fairly attributed to court orders or good-faith compliance. *Jackson* did not cause the government's non-disclosure of the July order. Nor did it cause the government to file an unprompted notice in this case, teeing up a dispute about Essayli's not-purporting theory and a hypothetical narrow delegation, only to backtrack a month later and rely on an actual delegation instead. And no court order caused the government's deficits of candor in this case and the others it has cited, including two separate misrepresentations to this Court about what the government argued in *Jackson*. *See infra* §§ I.A, VI.D; Dkt. 68, at 18–20.

The government could have formulated a statutorily and constitutionally compliant plan and presented it to the Court transparently. But this is not what good-faith compliance looks like. Instead, it is the same unnecessarily piecemeal "see what will stick" tactic that Chief Judge Brann rightly saw as evidence of bad faith. Dkt. 68,

at 22–23.

Neither the not-purporting theory nor the new delegation passes muster. The government is still trying to recreate a vacant office outside the governing statutory and constitutional bounds, and the Court should disqualify Essayli. Given the government's bad-faith conduct, the Court should also dismiss the indictment.

## ARGUMENT

### I. The Ninth Circuit rejected the government's stay argument, and this Court should do the same.

After *Jackson* issued, the government made an unusual request: that the Ninth Circuit "stay its judgment and therefore the precedential effect of the panel decision in *Jackson* until the Supreme Court has an opportunity to weigh in."[1] The Ninth Circuit refused. "Because the opinion has already issued, eliminating its precedential effect would effectively require vacating the opinion."[2] The government had identified "no cases from this or any other circuit" granting such extreme relief. *Id.*

Now, the government asks this Court to stay *Jackson*'s precedential effects. It should decline the invitation to do what the Ninth Circuit just refused.

#### I.A. The *Jackson* panel's order rejected this relief, and *Boyle* instructs this Court should follow that lead.

As the government concedes, "a published opinion is precedential upon its

---

[1] Government's Motion to Stay the Mandate and the Panel Judgment Pending Petition for Certiorari (Mandate Mot.) at 8, *United States v. Jackson*, No. 25-6214 (9th Cir. Aug. 20, 2026), ECF No. 62.

[2] Order 3, *United States v. Jackson*, No. 25-6214 (9th Cir. Aug. 21, 2026), ECF No. 63.

issuance." Mandate Mot. 8 (citing *In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017)).[3] *Jackson* "constitutes binding authority," here and now. *Zermeno-Gomez*, 868 F.3d at 1052.

Relying on *Trump v. Boyle*, the government says that the Ninth Circuit panel's order should inform how this Court exercises its discretion as to a stay. Dkt. 74, at 22 (citing 145 S. Ct. 2653, 2654 (2025)). The defense agrees: when asked whether *Jackson* should bind the district courts while certiorari is pending, the Ninth Circuit said yes. To the extent this Court applies *Boyle* and looks to the panel's order for guidance, that guidance is that courts should be applying *Jackson* today. To stay *Jackson*'s precedential effects would result in the same effective vacatur the Ninth Circuit rejected.

The government points to the stay of the *Jackson* mandate as evidence that the panel thought "the status quo should be maintained pending certiorari in *Jackson*." Dkt. 74, at 22. That argument lacks candor: it is the opposite of the view the government expressed to the Ninth Circuit.

In particular, the government told the Ninth Circuit that staying the mandate *would not* maintain the status quo. It was the separate stay of the precedential effects, the government said, that would be necessary "to maintain the status quo." Mandate Mot. 10. Otherwise, it explained, *Jackson* would take effect immediately across the districts, "[*e*]*ven if* [the Ninth Circuit] were to grant a stay of the mandate." *Id.* at 8. If the Ninth Circuit denied the precedential-effects stay, the government warned that

[3] The stay of the mandate in *Jackson* does not affect its precedential effect. *Zermeno-Gomez*, 868 F.3d at 1052 (cleaned up) ("In recognition of this principle, we have held that a stay of the mandate does not destroy the finality of an appellate court's judgment and that a published decision is final for such purposes as stare decisis….").

would "affect[] the ability of the heads of four U.S. Attorney's Offices within the Ninth Circuit to continue supervising criminal matters within their districts." *Id.* at 8.

Presented with that choice by the government, the Ninth Circuit affirmatively refused to maintain the pre-*Jackson* status quo. *Boyle* instructs that the Ninth Circuit made its choice deliberately, and this Court should refuse to reconsider it.

In the first on-point ruling of which counsel is aware, Judge Du in Nevada has now reached this same conclusion. "The Court must apply *Jackson* because it is binding authority. Indeed, the *Jackson* court made it so by declining to vacate its decision. Applying *Jackson* mandates disqualification of Ms. Chattah from supervising this case." Order (*Recinos* Order) at 4, *United States v. Recinos-Valdez*, No. 3:25-cr-10-MMD (D. Nev. Sept. 30, 2026). There is no reason to treat California defendants any differently, nor to deny them the benefits of precedent that the Ninth Circuit says is binding now.[4]

### I.B. The government has already told the Court to consider *Jackson*.

In this District in particular, the government itself prompted the renewed litigation. The government—not the defense—filed a notice of "new authority," noting that *Jackson* "may be relevant to the disqualification motions filed in these cases."

[4] The government says it would not "make any sense" to have a disqualification order in this District "while the disqualification order in Nevada itself remains stayed." Dkt. 74, at 22. The premise is mistaken. There is no singular "order in Nevada."

Only some of the orders in some Nevada cases are stayed—not because they are in Nevada, but because those cases were appealed and are still awaiting their mandates. For Mr. Ramirez, like Mr. Recinos-Valdez, there is no appeal and no mandate to await. *See Recinos* Order 2 & n.3.

Dkt. 66, at 2. The government then participated in a status conference with this Court and agreed to a briefing schedule on the defense's renewed motion. *See* Dkt. 67. The government's first filing could have laid out an argument for the Court staying its hand; it sought affirmative victory under *Jackson* instead.

The government called on this Court to consider *Jackson*'s relevance to this prosecution, and the Court should answer the call.

### I.C. The government cannot satisfy its burden to obtain a *Landis* stay—and does not try.

The government contends it is "entitled to a stay" of any forthcoming order by this Court "under a straightforward application of the factors in *Nken v. Holder*." Dkt. 74, at 22 (citing 556 U.S. 418, 434 (2009)). That argument is misplaced for two independent reasons.

First, this Court has not yet issued any such order. If and when it does, the government can seek a stay. But the government has identified no authority for refusing to decide this motion just because it might seek a stay of that decision and this Court might grant one. This very argument has now been rejected in Nevada, and it should be rejected here, too. *Recinos* Order 2 n.3 (emphasis added) ("[T]he government is not seeking a stay pending appeal of any orders issued *in this case*.").

Second, *Nken* governs a stay pending judicial review of an order in the very case being reviewed by the appeals court. 556 U.S. at 421, 425–26. What the government actually seeks here is to *stay Mr. Ramirez's case* while it appeals an adverse ruling in a *different* case. For that relief, the government must satisfy a much stricter burden, and it does not even try, thus waiving any argument to that effect.

For ninety years, the Supreme Court has instructed that only "in rare

circumstances will a litigant in one case be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). For the government to achieve that—to compel Mr. Ramirez to await Mr. Jackson's litigation—it "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay … will work damage to some one else." *Id.* That possible damage is at its highest point when a criminal defendant's liberty is at stake. *Yong v. INS*, 208 F.3d 1116, 1119–21 (9th Cir. 2000).

The government only hints at a possible harm: "irreparable injury to the functioning of the Executive Branch and the separation of powers." Dkt. 74, at 22. It does not describe what that injury would be in any concrete terms, nor does it offer any support for its speculation. The relief sought would not forestall the Executive from using available, lawful means to fill the vacancy.[5] And any supposed harm to the separation of powers is circular: it assumes the correctness of the government's position. If Essayli's service violates the FVRA or the Constitution, there is no separation-of-powers harm in ending that service.

There is thus no justification for a *Landis* stay, especially in a criminal case where the requested stay is indefinite. *Yong*, 208 F.3d at 1119–21. An indefinite stay would be particularly inequitable given the government's view that this case is not controlled by *Jackson* and will require novel legal rulings that will not be before the Supreme

[5] Indeed, just last week the President invoked 5 U.S.C. § 3345(a)(3) to designate the acting U.S. Attorney for the Western District of Washington. Memorandum for Charles Neil Floyd, Ex. B to Defendants' Unopposed Request for Order Taking Judicial Notice, *Rogoff v. Trump*, No. 2:26-cv-2566 (W.D. Wash. dated Sept. 25, 2026), ECF No. 42-3.

Court even if certiorari is granted. *See* Dkt. 66, at 7; Dkt. 74, at 1, 14–16, 19, 21–22; *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112–13 (9th Cir. 2005).

The proper course is to decide this motion, not to compel Mr. Ramirez to stand aside under the indefinite cloud of criminal charges.

### I.D. Even if *Nken* applied, the government has not carried its burden.

Even assuming *Nken* could be applied across cases in the novel manner urged here, the government cannot satisfy its burden to justify a stay. On the first factor, the government cites its own petition, but it does not even attempt to show that the Supreme Court will likely grant that petition, much less reverse. Dkt. 74, at 22. Nor could it: more than a dozen judges and all three Courts of Appeals have rejected the government's theories. Dkt. 68, at 20–22. The mere fact that the government has sought certiorari does not mean that it is likely to succeed.

On the second factor, the government has shown no harm, much less irreparable harm. As explained just above, the harm it hints at is speculative and unspecific. And even if the government had identified some harm—like some action it would be prevented from taking—it has not attempted to show that the harm would be irreparable.

The government misrepresents the law on the third and fourth factors by strategically misquoting *Nken*. The third factor is harm to the party opposing the stay; the fourth is the public interest. *Nken*, 556 U.S. at 435. "These factors merge when the Government is the opposing party." *Id.* But when the government *seeks* a stay, of course, the third factor's inquiry into the opponent's interests retains its independent force. In that scenario, courts consider the stay opponent's interests and the public interest separately. *Id.*

The government rewrites *Nken* into a test that the government always wins. In its new framework, "the third and fourth factors 'merge when the Government is' *one of the parties*." Dkt. 74, at 22 (emphasis added) (quoting *id.*). That rewritten rule would make no sense: it would mean that when the government wants a stay, the factor intended to protect the non-governmental party ("the opposing party") gets flipped on its head and weighs against that party.

At any rate, both these factors weigh against a stay. Defendants like Mr. Ramirez are entitled to challenge their prosecution by an official who lacks prosecutorial duties. Dkt. 38, at 33–36 (collecting cases). The public, too, is entitled to an answer about whether the District's top prosecutor is unlawfully serving. And the public is entitled to the orderly administration of justice in this District, whereas a stay invites delays, uncertainty, and confusion.[6]

## II. The wholesale delegation is invalid.

The defense agrees that as a prospective matter, Essayli's continued participation in and supervision of this prosecution is governed by the Attorney General's new delegation order to the extent it is valid. But in places, the government suggests that the theory in its post-*Jackson* notice still has force—i.e., that Essayli still derives powers from the purported July 2025 wholesale delegation. *See* Dkt. 74, at 13, 14–15, 17–19,

---

[6] *See, e.g.*, Tracey Tully, "N.J. Criminal Cases Screech to a Halt as Habba's Authority Is Challenged," *N.Y. Times* (July 28, 2025), https://www.nytimes.com/2025/07/28/nyregion/alina-habba-new-jersey-us-attorney-battle.html; Tracey Tully & Jonah E. Bromwich, "Inside the Crisis Gripping New Jersey's Federal Courts," *N.Y. Times* (Aug. 28, 2025), https://www.nytimes.com/2025/08/28/nyregion/new-jersey-federal-court-slowdown.html.

21. This section responds to the government's arguments about that theory.[7]

### II.A. The first-assistant delegation confers no powers.

The government now appears to "accept[]" that, under *Jackson*, "the only function of a FAUSA *inherent to the position of FAUSA* may be to become the Acting U.S. Attorney under the FVRA." Dkt. 74, at 17; *accord* Dkt. 68, at 12 (citing *United States v. Jackson*, No. 25-6214, 2026 WL 2387099, at *12 (9th Cir. Aug. 17, 2026), *cert. pending*, No. 26-304 (docketed Sept. 8, 2026)). Its argument no longer relies on the mere designation as first assistant to confer any powers on Essayli. *See* Dkt. 74, at 17.

### II.B. There is no seniormost-attorney doctrine.

Having relented on the first-assistant designation, the government says "the issue here is *supervisory authority* more generally." *Id.* Even if a first assistant has no inherent lawful duties, the government says that Essayli can perform the lawful duties of a supervising attorney. *Id.* It says that no matter what, someone will "be the seniormost AUSA." *Id.* at 21 n.11. And because Essayli is the seniormost, the government assumes he automatically gets the power to supervise prosecutions.

But as the renewed motion explained, those powers must actually be delegated. Dkt. 68, at 14–15. An assistant U.S. Attorney does not magically acquire new powers by virtue of his seniority. Perhaps a statute or regulation could achieve that automatic

[7] Other defendants have now sought to challenge specific actions taken during the period between *Jackson* and the Attorney General's new delegation order, during which time the wholesale-delegation theory was the only purported basis for Essayli's service. *See* Motion to Dismiss and to Disqualify, *United States v. Appriou*, No. 2:26-cr-574 (C.D. Cal. Sept. 29, 2026), ECF No. 26; Motion to Dismiss and to Disqualify, *United States v. Rivera-Flores*, No. 2:26-cr-598-MCS (C.D. Cal. Sept. 29, 2026), ECF No. 22.

result, as the FVRA does in limited circumstances. But there is no default mechanism for the seniormost attorney to assume supervisory powers unilaterally, and the government does not identify any.

The government says there "is no basis" for the view that the Attorney General must delegate supervisory powers. But the defense come up with that rule: Congress did. "The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." 28 U.S.C. § 510. The Attorney General must actually make those provisions. That requirement is not dispensed with just because an attorney is the seniormost in his office.

The government's hypothetical, involving Essayli's resignation, illustrates the point. As the government explains, if Essayli were to resign, the chief assistant Jennifer Waier would become "the seniormost AUSA in the office." Dkt. 74, at 21 n.12. The government says Waier would then "effectively have to supervise everyone else," but it contends she "obviously could not *become* unlawful" in that scenario. *Id.* She very much could. If the Attorney General has not made a delegation of supervisory powers to Waier as required by § 510, her unilateral attempt to claim those powers would be invalid. It would be no different if she claimed those powers today, with Essayli still in office. Or if a line assistant were to claim supervisory powers and start issuing orders *to* Essayli. Those would be exercises of authority the claimant does not possess.

The statute requires the Attorney General to "make such provisions" to delegate his power. 28 U.S.C. § 510. At least until the Attorney General's September 23 order, no such provision had been made to Essayli. He may have been the seniormost

attorney, but the government points to no source of powers for him by virtue of that status.

**II.C. The special-attorney appointment confers no powers.**

The renewed motion explained that Attorney General Bondi's appointment of Essayli as special attorney did not confer any powers on him: that office[8] has no inherent powers and none were specifically delegated to Essayli, as *Jackson* explained. Dkt. 68, at 12–13 (citing *Jackson*, 2026 WL 2387099, at *12).

The government does not respond directly. Instead, as just noted, it simply assumes that "Special Attorneys under § 515(a) … [are] allowed to prosecute cases and supervise others." Dkt. 74, at 2; *accord id.* at 11, 17. That is not correct: special attorneys are allowed to prosecute cases and supervise others to the extent they are validly delegated those powers. *Jackson*, 2026 WL 2387099, at *12.

Again, the government runs into the problem that the Attorney General *can* delegate supervisory powers, but she must actually delegate them. The government makes the uncontroversial point that "'the statutes and regulations that establish the structure of the Department of Justice … permit the delegation of many—if not most—of the Attorney General's duties,' allowing 'AUSAs to perform duties that are not exclusive to the office of the United States Attorney.'" Dkt. 74, at 3 (quoting *United States v. Ramirez*, 807 F. Supp. 3d 1086, 1113 (C.D. Cal. 2025)).

Exactly so: the statutes and regulations *permit* delegation. But then the government jumps to the conclusion that because power *can* be delegated, it necessarily

[8] Mr. Ramirez preserves his argument that 28 U.S.C. § 515 does not create an office at all. *See* Dkt. 38, at 18–19; Dkt. 57, at 11–13; Dkt. 9–11.

already has been. No statute says that, nor any regulation or case law.

**II.D. The human-resources letter attempts a wholesale delegation that is invalid twice over.**

The government does not defend the July 2025 human-resources letter as a source of power for Essayli. *See* Dkt. 68, at 13; *see generally* Dkt. 74.

**II.E. Essayli cannot exercise powers delegated to other attorneys.**

The renewed motion explained that even assuming the Attorney General had made a background delegation of supervisory powers to some Department lawyers (like criminal chiefs), no such delegation had been made to Essayli. Dkt. 68, at 14–15 & n.11. He could not exercise those other lawyers' delegated powers just by virtue of being a Department lawyer himself. *Id.*

But as explained above, the government now fails to identify any such background delegation. It just assumes that line attorneys, like assistant U.S. Attorneys, are "allowed to prosecute cases and supervise others," Dkt. 74, at 2, based on the statutory possibility that they could be delegated such powers, *id.* at 3, 11, 13, 15–16, 17–19. And it assumes the *seniormost* attorney acquires supervisory powers out of thin air. *Id.* at 21 & nn.11-12.

The government balks at the notion that actual delegations could be necessary. "There is still an office full of AUSAs; can no one be in charge?" *Id.* at 20. The answer, of course, is for the Attorney General to make valid delegations—not to skate by on the mere possibility that he could. The other answer is to fill the vacancy lawfully.

## III. The July appointment and September delegation do not salvage Essayli's service.

For the first time, an Attorney General has now made a delegation of powers to Essayli. Order of the Attorney General No. 7207-2026 (Sept. 23, 2026), Dkt. 74-1. He did so on the day the government's opposition was due in this case.

And the government has also now belatedly revealed that Attorney General Blanche appointed Essayli as an assistant U.S. Attorney back in July. Blanche did so in an order titled, oddly, "Order No. __," using a signature strikingly different than the one he used in September. Order of the Attorney General No. __ (July 29, 2026), Dkt. 74-2.

Neither order renders Essayli's service valid, and the Court should grant the motion to disqualify him.

### III.A. The July appointment does not validate Essayli's service.

As an initial matter, Mr. Ramirez objects to the Court's consideration of the July appointment order. The circumstances of its issuance are suspect: it is unnumbered where it should be, and the different signature on the September order provides reason to believe different people signed the two orders. *See* Dkt. 74-1, 74-2. The fact that the government omitted this development from its post-*Jackson* notice both adds to that suspicion and leaves the government with unclean hands. *See generally* Dkt. 66. The Court should not permit the government to rely on an order that issued and then failed to disclose.

If the Court does consider the July order, it does not defeat the case for disqualification. First, as explained above, assistant U.S. Attorneys do not have the inherent power to supervise prosecutions—not even if they are very senior. That power must be delegated to them.

Second, even if assistant U.S. Attorneys are assumed to have the inherent authority to *assist U.S. Attorneys* in the prosecution of cases, 28 U.S.C. § 542, no statute grants them standalone authority to prosecute cases outside of that capacity, unless that authority is delegated to them, *see, e.g.*, *id.* § 515(a). The Attorney General's July order could have—but did not—attempt to delegate the Attorney General's own independent prosecutorial authority to Essayli. *See* Dkt. 74-2. Accordingly, Essayli's powers did not increase (from zero) in July when he was appointed an assistant.

Even if the Court disagrees and finds that Essayli obtained the basic power to prosecute as an assistant U.S. Attorney, he should still be disqualified. As explained below, the government's bad-faith conduct warrants sanctions. At the very least, that should include disqualifying Essayli as a backward-looking sanction, even if disqualification is not necessitated based on a forward-looking assessment of the delegations.

### III.B. The September delegation is invalid.

The Attorney General's new delegation avoids some of the justiciability problems presented by the government's first post-*Jackson* theory. But it still violates the FVRA and the Constitution, and Essayli should still be disqualified.

#### III.B.1. The September delegation is self-contradictory boilerplate.

The government maintains that there are no non-delegable U.S. Attorney powers. Dkt. 74, at 15. At the same time, it asks this Court to accept its representation that Essayli will not exercise the non-delegable powers of the U.S. Attorney. *Id.* It expressly identifies only three of those non-delegable powers and leaves the reader to guess at the others. *Id.* The delegation "provides no mechanism to enforce or track its

limitation of authority." *Bullock v. U.S. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1126 (D. Mont. 2020).

The Court should not accept a regime where Essayli disavows an unspecified set of non-delegable powers, simultaneously claims there are no such non-delegable powers, and then gets to self-enforce those contradictory limits. This is precisely why boilerplate delegations are unreliable and invalid. *See Jackson*, 2026 WL 2387099, at *12. That self-enforcement regime is particularly unreasonable given the government's track record, in which it has repeatedly sought to achieve the results of non-delegable powers by improper means lacking in candor. *See* Dkt. 68 at 5–8, 10; *infra* § VI.B.

**III.B.2. The September delegation violates the FVRA.**

As *Jackson* held, the FVRA does not tolerate the creation of a de facto U.S. Attorney. 2026 WL 2387099, at *1, 3, 11–13. And as the renewed motion explained, a wholesale delegation is invalid even when it attempts to delegate all but a few of a vacant office's powers. Dkt. 68, at 9–10.

That is not the unjust, illogical, or novel result the government claims. *See* Dkt. 74, at 19–21. The settled rule—as old as the Department of Justice—is that congressional intent should be effectuated in the face of statutory evasions. *E.g.*, *United States v. Villalonga*, 90 U.S. 35, 44 (1874) ("A construction of the law which admits of such a consequence cannot be correct. The intention of Congress is not thus to be evaded."); *United States v. Trinidad Coal & Coking Co.*, 137 U.S. 160, 166-67 (1890) ("This contention cannot be sustained unless the court lends its aid to make successful a mere divice [sic] to evade the statute. … It was for congress to prescribe the conditions…, and its intention should not be defeated by a narrow construction of the

statute.”); *Edison Elec. v. City of Pasadena*, 178 F. 425, 431 (9th Cir. 1910) (“The positive prohibition of a statute can no more be avoided by evasion than it can be violated directly. A citation of authorities upon so plain a proposition is unnecessary.”).

The FVRA prohibits de facto service in a vacant office. That precludes wholesale delegations as in *Jackson*, but it also precludes virtually wholesale delegations, too. Several courts have applied the FVRA with this rule in mind, rejecting the view that the disavowal of some powers can validate an otherwise comprehensive delegation. Dkt. 68, at 9 (citing *In re Grand Jury Subpoenas to the Office of the N.Y. Att'y Gen.*, No. 26-156, 2026 WL 2450485, at *13 (2d Cir. Aug. 21, 2026), *cert. pending*, No. 26-348 (docketed Sept. 15, 2026)); *Widakuswara v. Lake*, 832 F. Supp. 3d 55, 66 (D.D.C. 2026)).

The government presents no argument in response. It does not cite a single case to contrary. It just says that this issue was not directly addressed in the recent U.S. Attorney decisions. Dkt. 74, at 19. But this is *the* critical issue in this case today. The government should be expected to have some colorable basis to defend the action it has taken. Yet no law supports the view that the government can validate a delegation by withholding just one stick—or even just a few, not fully identified sticks. Dkt. 68, at 9–10 (citing *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 681–82, 687 (2010)). The government's silence confirms the point.

## IV. The Appointments and Apportionments Clauses also invalidate Essayli's service.

As the renewed motion explained, Mr. Ramirez asserts and preserves his argument that Congress has never created the de facto U.S. Attorney office that Essayli now occupies as special assistant. Dkt. 68, at 15–16. The same is true for the other

supposed offices to which the government now ascribes unclear powers, like "seniormost AUSA." Dkt. 17, 21 n.11, 21 n.12. The defense understands that this Court has disagreed. *Id.*

On the Appropriations Clause, the government's two-sentence response merely cites back to the original *Ramirez* decision. Dkt. 74, at 20 (citing 807 F. Supp. 3d at 1110 n.24). But *Ramirez* addressed a different Appropriations argument raised by Mr. Rojas, in which there was "no dispute about the funding for … the prosecutors who are prosecuting [Mr. Rojas]." 807 F. Supp. 3d at 1110 n.24 (citing Dkt. 33, at 19 n.10).

Mr. Ramirez *does* dispute the funding for the prosecutors who are prosecuting him. And the facts on the ground have changed: Essayli now purports to be exercising the supervisory power of the Attorney General himself, rather than (or in addition to) the powers derived from the vacant office. *E.g.*, Dkt. 74-1. But if Essayli's supervision is validated by his use of the Attorney General's *authority*, it must be funded by his use of the Attorney General's appropriations, too. Dkt. 68, at 16–17.

The government has no response. It does not dispute the legal proposition that a mismatch between authority and funding would violate the Appropriations Clause. Nor does it dispute as a factual matter that there is a mismatch. And it does not address Mr. Ramirez's request that the Court order the government to produce the facts about this dispute. *See* Dkt. 68, at 17. The Appropriations Clause requires disqualification or, at the very least, production of evidence sufficient to assess and resolve the mismatch.

## V. The Court should disqualify Essayli from participating in or supervising this prosecution.

If Essayli lacks the power to participate in or supervise this prosecution, he should be disqualified. The government appears to have retreated from its strange

suggestion that *Jackson*—a decision that explicitly affirmed a remedial disqualification order—"did not reach the remedies issue." Dkt. 66, at 7. This is simple: if prosecutorial duties have not been validly delegated to a government lawyer, the Court should tell him to stop prosecuting.

In the event the Court concludes that Essayli's appointment as an assistant U.S. Attorney permits him to function as a line prosecutor, disqualification would still be warranted for two reasons. First, the Court should disqualify Essayli as a backward-looking sanction for the government's bad-faith conduct as described in the next section. Second, even if Essayli has the power to prosecute cases as an assistant, he still has not been validly delegated the power to *supervise* prosecutions. The proposed disqualification order would therefore still be appropriate. *See* Dkt. 69. Essayli could participate in cases, but the Court should require that the other prosecutors in this case certify he is not supervising them—i.e., not exercising an invalidly delegated power.

**VI. The Court should dismiss the indictment.**

The government disputes whether the bad-faith standard for dismissal has been met. Dkt. 74, at 11–13. It has. The government has pursued statutory and constitutional circumvention and lacked candor in its shifting theories, in its litigation in this case, and in the post-*Ramirez* track record it now invokes to support its view. Contrary to the opposition brief, the blame for these machinations cannot be shifted to the judiciary. *See, e.g.*, Dkt. 74, at 12 (asserting a "good-faith attempt to advocate … while still complying with adverse decisions").

The defense offers the following five examples of the government's bad-faith conduct.

**VI.A. The trick.**

From the start, Essayli broadcast the government's bad faith. The government circumvented the law with the four-step maneuver it used to appoint Essayli in July 2025, *Ramirez*, 807 F. Supp. 3d at 1094–1105, and it did so with a subjectively bad purpose, Dkt. 10, at 2 & n.2 (citing Essayli's public characterization of the maneuver as "some tricks up our sleeves").

These were the government's first two novel and incorrect theories: backfilling the first-assistant role and delegating the vacant office's powers wholesale. Dkt. 33, at 5–9, 11–15. Neither of those faulty theories was motivated by a court order. Rather, they arose from the Executive's desire to name and empower the "highest-ranking supervisory authority" that it "want[s]," Dkt. 74, at 21, notwithstanding the limits Congress has imposed.

**VI.B. The not-purporting.**

The government previously urged the Court to rely on Essayli's track record of not-purporting to exercise non-delegable U.S. Attorney powers. Dkt. 66, at 6–7. That track record demonstrates bad-faith maneuvering around statutes and the government's failures of candor, not good-faith compliance.

The renewed motion described the government's lack of candor and circumvention attempts in *Castro*, *Skinner*, *Pierce*, and *Bilzerian*. Dkt. 68, at 6–7. In response, the government trivializes the defense as "complaining." Dkt. 74, at 4 n.3. It offers no law and no argument. It does not actually defend its conduct in even *one* of those instances, nor does it explain its lack of candor.

*Skinner* illustrates the point. *See* Dkt. 68, at 6 & nn.3–5 (collecting citations). In February 2026, the government assured the Ninth Circuit there was jurisdiction over its

*Skinner* appeal based on Essayli's certification under 18 U.S.C. § 3731. But the government claims that at that point in time, Essayli was not-purporting to exercise the § 3731 power. Dkt. 66, at 6–7.

Also at that point in time, the government knew that to proceed on a certification by someone other than the U.S. Attorney personally, it had the responsibility to file "documents establishing [that person]'s authority to sign" the certificate." *United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000). And the government knew that it had an obligation "to cure or justify the absence of the United States Attorney's certification," rather than leave it to the Ninth Circuit to "raise[] the issue sua sponte." *United States v. Weyhrauch*, 544 F.3d 969, 973 (9th Cir. 2008).

The government did none of those things. It did not document Essayli's authority to certify. It did not disclose his not-purporting. It did not cure or justify the invalid certification. Instead, it filed a brief that tried to sweep those issues under the rug and affirmatively invoked Essayli's certification, to establish both its right to pursue the appeal and the Ninth Circuit's jurisdiction. None of this was driven by a good-faith effort to comply with court orders: no court ordered Essayli to certify those appeals, and no court ordered him to keep silent about his authority.

This is not "complaining that the government failed to dismiss its appeals fast enough." Dkt. 74, at 4. The government affirmatively invoked a power that Essayli exercised, at a time when Essayli was supposedly not-purporting to exercise that power. The government had disclosure obligations, and it disclosed nothing. It hoped the Ninth Circuit would not notice.

**VI.C. The non-disclosure of the July order.**

Throughout this litigation, the parties have agreed on a material fact: Essayli was

not an assistant U.S. Attorney. *E.g.*, Dkt. 57, at 10–11; Dkt. 59, at 9.

That material fact changed apparently changed in July 2026. Dkt. 74-2. A month later, *Jackson* issued, and the government filed its unprompted notice. Dkt. 66. But nowhere in that notice did the government disclose that Essayli is apparently now an assistant U.S. Attorney. *See generally id.* Again, this was not good-faith compliance with a court order: no one ordered the government to file anything, much less an incomplete account.

**VI.D. The response to *Jackson*.**

Likewise, no one—especially not Mr. Ramirez—invited the shenanigans that have ensued after *Jackson*. The government could have deliberated and come up with a compliant plan. It could have fashioned a new delegation to Essayli in the first instance.

Instead, it volunteered a theory about a hypothetically narrowed delegation, from which it has mostly retreated. Dkt. 66. It now appears that was a fake-out. The government nowhere explains why the Court and Mr. Ramirez were strung along for that unnecessary detour.

Then, the government obtained new indictments by invoking Essayli's old, wholesale (and invalid) delegation, rather than making a new one. And it badly mischaracterized *Jackson* as having avoided a remedial issue (prospective disqualification) that the panel in fact decided. Dkt. 68, at 18–20. Even now, it seeks to stay *Jackson*'s precedential effects without being candid to this Court about the contradictory argument it made to the Ninth Circuit about the status quo.

None of this was prompted by a court order or good-faith compliance. No court ordered the government to try briefly to resuscitate the *Jackson*-invalidated delegation. No court ordered the government to zig-zag from the not-purporting theory to a new

delegation. And no court ordered the government to make a misleading stay request seeking relief the Ninth Circuit had just denied. Regardless of this litigation's ultimate, the bewildering route charted by the government is evidence of its bad faith.

**VI.E. The failure to pursue lawful means for filling the vacancy.**

The government ultimately lands in the same place as the defense: "what then?" Dkt. 74, at 20. "There is still an office full of AUSAs; can no one be in charge?" *Id.*

The defense understands the government's frustration. It is rattling at the bars of a cage: surely someone must be able to lead the U.S. Attorney's office in this District. But that cage is self-created. Twenty months since the vacancy, and the government has not taken a single step along any of the other lawful avenues toward filling it.

The question is not really whether anyone can lead the office during a vacancy. It is whether a President can deliberately *maintain* a vacancy, make no nomination, violate one of Congress's alternative options, eschew the other alternatives, and *still* insist on naming a temporary manager who is not eligible. That is not good-faith compliance, nor is it compelled by court orders. And it offends the deal struck by the Constitution and by Congress, which enables a President to temporarily fill a vacancy while he works in good faith to confirm his nominee.

## CONCLUSION

The Court should grant the motion, disqualify Essayli, and dismiss the indictment. In the alternative, Mr. Ramirez respectfully requests that the Court order the production identified in the renewed motion; the government has not responded to or objected to that request. *See* Dkt. 68, at 17.

Respectfully submitted,

AMY M. KARLIN
Interim Federal Public Defender

Dated: September 30, 2026 By: */s/ James Anglin Flynn*
JAMES ANGLIN FLYNN
AYAH A. SARSOUR
Deputy Federal Public Defenders

*Attorneys for Defendant*
*Jaime Hector Ramirez*